IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PAN-AMERICAN PRODUCTS      )
HOLDINGS, LLC,                 )
                             )
       Plaintiff,      )
                             )
   v.                 )
                             )
R.T.G. FURNITURE CORP.,     )
ROOMSTOGO.COM, INC.,        )
ROOMS TO GO NORTH CAROLINA CORP., )     10-cv-508
ROOMS TO GO TENNESSEE CORP.,   )
R.T.G. FURNITURE CORP. OF GEORGIA, )
ROOMS TO GO LOUISIANA CORP.,    )
RTG FURNITURE OF TEXAS, L.P.,   )
ROOMS TO GO MISSISSIPPI CORP.,   )
ROOMS TO GO ALABAMA CORP.,     )
RETAIL MANAGEMENT SERVICES CORP.,  )
                             )
       Defendants.     )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

    This is an action alleging copyright infringement as well as breach of contract, unjust enrichment, unfair competition, and unfair and deceptive trade practices under North Carolina law. Several motions are before the court. Five Defendants -- R.T.G. Furniture Corp., Rooms to Go Tennessee Corp., Rooms to Go Louisiana Corp., Rooms to Go Mississippi Corp., and Rooms to Go Alabama Corp. ("Jurisdictional Defendants")[1] -- move to dismiss the First Amended Complaint ("FAC") for lack of personal

---

[1]   The Jurisdictional Defendants are distinguished from the non-Jurisdictional Defendants; collectively, both groups are referred to herein as "Defendants."

jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). (Doc. 28.) Plaintiff Pan-American Products & Holdings, LLC ("Pan-American") opposes the motion and moves in the alternative for jurisdictional discovery. (Doc. 34.) In addition, the non-Jurisdictional Defendants move to dismiss the FAC for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that the state law claims are preempted under the Copyright Act, 17 U.S.C. § 301, and the copyright claim fails; the Jurisdictional Defendants join in that motion if the court denies their jurisdictional motion. (Doc. 30.) All motions have been fully briefed and are ready for decision. For the reasons set forth herein, Jurisdictional Defendants' motion will be granted in part and denied in part without prejudice, Pan-American's motion for jurisdictional discovery will be granted (as limited by the court), and Defendants' motion to dismiss for failure to state a claim will be granted in part and denied in part.

## I.    BACKGROUND

The FAC alleges the following facts.

Pan-American designs and brokers the manufacture of furniture for wholesalers and retailers. It receives a commission for such sales, "typically from the furniture

2

manufacturers." (Doc. 23 ¶ 21.) Although Defendants are separate corporations, the FAC refers generically to all Defendants as "Rooms to Go," which is allegedly "one of the largest retailers of furniture in the United States," "operat[ing] stores throughout the United States" as well as conducting sales over the Internet. (Id. ¶ 23.)

In late 2003, Peter Aiken, an artist and professional furniture designer who later assigned his ownership rights to Pan-American, created furniture identified as the "Retro Collection." Works of art interpreting the "Art Deco" style were incorporated into the furniture designs. Pan-American alleges that the Retro Collection reflects "creative spark" and the creator's "artistic judgment." (Id. ¶ 25.) As an example, Pan-American alleges "a collection of panels with alternating grains in order to create a sense of depth and visual tension" and tapered appliques which were capable of existing separate and apart from the bed's functional or useful purpose. (Id. ¶¶ 26, 27.)

In late 2003 and into the Spring of 2004, Pan-American President Chris Anderson ("Anderson") met with "Rooms to Go" to discuss terms and conditions under which Rooms to Go would sell furniture incorporating the Retro Collection design. (Id. ¶ 29.) "It was discussed and agreed" that Rooms to Go would

3

acquire no ownership interest in the designs and that it would be required to use Pan-American to broker the manufacture of furniture made pursuant to Retro Collection designs. (Id.) As a result of such purchases, Pan-American would earn and receive a commission from the manufacturer. (Id.) The typical commission for brokerage work was ten percent (10%) of the invoiced amount, and "Pan-American and Rooms to Go operated under such arrangements with regard to other products." (Id.)

In December 2003, Pan-American organized a visit to a Brazilian factory that had manufactured Retro Collection samples. Dan Bazarte ("Bazarte"), a buyer with Rooms to Go, and Tom Maldondo, a quality control representative for Rooms to Go, participated in the visit. (Id. ¶ 31.) The next month, Anderson met with Bazarte, "Rooms to Go" President Jeff Seaman ("Seaman"), and others in Atlanta, Georgia. (Id. ¶ 32.) Pan-American alleges, "upon information and belief," that Bazarte is a buyer for all Defendants, that Seaman is an officer in all or most of the Defendants, and that both acted on behalf of all Defendants at all times in their dealings with Anderson. (Id.) During these meetings, Rooms to Go expressed an interest in selling the Retro Collection in its stores and "confirmed its agreement that if it did so, it would use Pan-American to broker the manufacture of such furniture." (Id. ¶ 33.)

4

Based on the parties' discussions, in February 2004 Pan-American provided Rooms to Go with samples of the Retro Collection as well as copies of the designs. The designs were marked as copyrighted. (Id. ¶ 34; Doc. 23-1, Ex. A.) In the spring of 2004, Anderson and Rooms to Go continued to discuss the sale of furniture manufactured pursuant to the Retro Collection designs, focusing primarily on pricing terms. Pan-American negotiated pricing with a Brazilian manufacturer and reached an agreement with that manufacturer under which Pan-American would receive a ten percent (10%) commission. (Doc. 23 ¶ 35.) At Rooms to Go's request, Pan-American provided Rooms to Go with a revised pricing sheet via e-mail dated April 25, 2004. (Id. ¶ 35; Doc. 23-2, Ex. B.) Pan-American alleges its e-mail "clearly reflects the parties' agreement that the designs to the Retro Collection would remain the property of Pan-American." (Doc. 23 ¶ 35.) The e-mail instructed Rooms to Go to submit all orders for the furniture to Pan-American. (Id. ¶ 36.)

Rooms to Go subsequently attempted to negotiate lower pricing terms from the Brazilian manufacturer directly but, failing to reach an agreement, did not submit any orders to Pan-American for the manufacture of furniture incorporating Retro Collection designs. (Id. ¶ 37.) Pan-American alleges that, unbeknownst to it, Rooms to Go copied and/or created derivative

5

works based on Pan-American's Retro Collection, or instructed others to do so. (Id. ¶ 47.)

In late 2009, Pan-American learned that Rooms to Go was selling furniture incorporating the Retro Collection design under the name "Chaplin Collection," which included dining and living room pieces, bedroom pieces, and an entertainment piece. (Id. ¶¶ 38, 39; Doc. 23-3, Ex. C.) Pan-American asserts that Rooms to Go's Chapin Collection contains copies or derivative works of Pan-American's Retro Collection. (Doc. 23 ¶ 48; compare Doc. 23-1, Ex. A with Doc. 23-3, Ex. C.) Rooms to Go allegedly knew its actions constituted copyright infringement and acted in reckless disregard of Pan-American's copyright rights. (Doc. 23 ¶ 49.) Rooms to Go never sought or obtained Pan-American's permission to use its Retro Collection designs and has not paid it to broker the manufacture of such furniture. (Id. ¶¶ 40, 41.)

Pan-American contends that its Retro Collection designs contain material that is wholly original and copyrightable under the laws of the United States. (Id. ¶ 43.) In 2009, the U.S. Copyright Office issued copyright registrations for two-dimensional designs for each piece of the Retro Collection,

6

which identify Pan-American as the copyright claimant.[2]  (Id. ¶ 44; Doc. 23-4, Ex. D.)  On September 17, 2010, six days before filing the FAC, Pan-American submitted an application with the U.S. Copyright Office to register three-dimensional/sculptural work embodied in the Retro Collection designs for a round mirror design, short dresser design, medium dresser design, armoire design, and nightstand design.[3]  (Doc. 23 ¶ 46.)

The Jurisdictional Defendants now challenge this court's exercise of jurisdiction over their persons, and all Defendants move to dismiss all claims on the ground that the state law claims are preempted under the Copyright Act and the copyright claim fails to state a claim.  Because the court's jurisdiction over the Jurisdictional Defendants is a threshold issue, it will be addressed first.

---

[2]  The effective date of registration for the two-dimensional designs is November 10, 2009, while the date of first publication, according to the Certificates of Registration, was September 30, 2003.  (Doc. 23-4, Ex. D.)

[3]  In its brief, Pan-American acknowledges that the U.S. Copyright Office rejected its applications to register the three-dimensional works incorporated into the Retro Collection design but argues that rejection does not create a presumption of invalidity.  This rejection may be a result of Pan-American's attempt to broaden its copyrights for the same version of design beyond the "2-D Artwork" for which the U.S. Copyright Office previously issued certificates of registration. Pan-American argues that the validity of its rejected designs is to be determined by the court (Doc. 39 at 18 n.1.), an argument addressed below.

## II. MOTION TO DISMISS PURSUANT TO RULE 12(b)(2) AND MOTION FOR JUSISDICTIONAL DISCOVERY

### A. Motion to Dismiss Pursuant to Rule 12(b)(2)

The FAC contains the following allegations of personal jurisdiction:

> This Court has personal jurisdiction over Rooms to Go under the provisions of N.C. Gen. Stat. § 1-75.4 and consistent with the principles underlying the U.S. Constitution because Rooms to Go has committed tortious acts that were directed toward this State and have otherwise conducted business in this State such that Rooms to Go has sufficient minimum contacts with the State of North Carolina to permit the exercise of personal jurisdiction.

> In particular, upon information and belief, the acts complained of below were committed by agents of and on behalf of all the Defendants such that those agents' contacts can be attributed to each of the Defendants for purposes of personal jurisdiction.

> Upon information and belief, the Defendants are commonly owned, have overlapping board of director members, and are all managed by a single entity. In addition, upon information and belief, all of the Defendants operate an integrated software system and operate as a single entity with regard to decision-making procedures for selecting furniture to sell in the Rooms to Go retail stores and over the internet. Upon information and belief, the Defendants also all operate under a common trade name, share a common logo, and advertise themselves as a single entity.

> The Defendants, upon information and belief, are controlled by the same collective owners and have no separate mind, will, or identity of their own. Moreover, Defendants have authorized each other to act on each other's behalf and have delegated responsibility and authority to act for each other with regard to the matters alleged herein. Therefore, the contacts and activities of each Defendant can be

8

> attributed to the other Defendants for purposes of personal jurisdiction.

(Doc. 23 ¶¶ 15-18 (paragraph numbering omitted).)

In its briefing, Pan-American focuses its argument on grounds for specific jurisdiction based on Jurisdictional Defendants' alleged use of representatives to negotiate and contract with Pan-American, a North Carolina entity, the Jurisdictional Defendants' alleged purposeful copyright infringement, and their advertising and promotions in North Carolina. (Doc. 36 at 10-17.) Jurisdictional Defendants argue that Pan-American's alleged grounds to support specific jurisdiction fail. (Doc. 29 at 5-8; Doc. 45 at 7-8.) In the alternative, Pan-American contends that it has demonstrated sufficient grounds to pursue discovery to prove its jurisdictional contentions, including its theory that the non-Jurisdictional Defendants (who have not contested the exercise of general jurisdiction over them) were alter egos of the Jurisdictional Defendants.

### 1. Personal Jurisdiction Standards

Pan-American ultimately bears the burden of proving personal jurisdiction by a preponderance of the evidence. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). Where a challenge to personal jurisdiction is addressed only on the basis of motion papers, supporting legal memoranda, and the relevant

allegations of a complaint, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." Id. Under those circumstances, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id. In cases where the defendant provides evidence that denies the facts essential for jurisdiction, the plaintiff must present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant and on which the defendant presented evidence. Pinpoint IT Servs., L.L.C. v. Atlas IT Export Corp., No. 2:10cv516, 2011 WL 2748685, at *3 (E.D. Va. July 13, 2011); Indus. Carbon Corp. v. Equity Auto & Equip. Leasing Corp., 737 F. Supp. 925, 926 (W.D. Va. 1990). If the existence of jurisdiction turns on disputed factual questions, the court may resolve the challenge on the basis of an evidentiary hearing, or when a prima facie demonstration of personal jurisdiction has been made it can proceed "as if it has personal jurisdiction over this matter, although factual determinations to the contrary may be made at trial." Pinpoint IT, 2011 WL 2748685, at *3 (citing 2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.31 (3d ed. 2011));

10

<u>Combs</u>, 886 F.2d at 676. In any event, the plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing. <u>New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.</u>, 416 F.3d 290, 294 n.5 (4th Cir. 2005).

Although copyright infringement may have a multistate impact, a violation of copyright law in another state does not automatically provide a district court in the copyright holder's state of residence personal jurisdiction over the alleged infringer. Federal law can provide for nationwide service of process, and in its absence a district court may exercise nationwide jurisdiction regarding federally-created rights only in accord with Federal Rule of Civil Procedure 4. <u>Autoscribe Corp. v. Goldman & Steinberg, Inc.</u>, No. 94-1749, 47 F.3d 1164, 1995 WL 56662, at *3 (4th Cir. 1995) (unpublished table decision) (citing <u>Omni Capital Int'l v. Rudolf Wolff & Co.</u>, 484 U.S. 97, 108 (1987)). The Copyright Act does not specify the manner of service, limiting the district court's power to exercise personal jurisdiction to Rule 4 and the North Carolina long-arm statute, which Rule 4 incorporates by reference. <u>Id.</u> 1995 WL 56662, at *3, *8; <u>Culp, Inc. v. Huntington Fabrics, Inc.</u>, No. 1:09-cv-611, 2011 WL 1230820, at *2 (M.D.N.C. Mar. 28,

11

2011) (applying two-step analysis engaged in diversity cases to copyright personal jurisdiction).

To determine whether personal jurisdiction is proper, therefore, the court engages in a two-part inquiry: first, North Carolina's long-arm statute must provide a statutory basis for the assertion of personal jurisdiction, and second, the exercise of personal jurisdiction must comply with due process. Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001); Vogel v. Wolters Kluwer Health, Inc., 630 F. Supp. 2d 585, 594-95 (M.D.N.C. 2008). As the parties note, courts have historically construed North Carolina's long-arm statute to be coextensive with the Due Process Clause, thereby collapsing the two requirements "into a single inquiry" whether the non-resident defendant has such "minimum contacts" with the forum state that exercising jurisdiction over it does not offend "traditional notions of fair play and substantial justice." Christian Sci., 259 F.3d at 215 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).[4]

---

[4] Recently, in Brown v. Ellis, 363 N.C. 360, 363, 678 S.E.2d 222, 223 (2009), the North Carolina Supreme Court emphasized that the two-step process is, in fact, a two-step process, and that jurisdiction under North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4, must first be determined. However, because the court finds that Pan-American cannot meet the constitutional step at this time, see infra, the statutory step is irrelevant.

Jurisdiction over a defendant may be either general or specific. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8 & 9 (1984). Whereas a court may exercise general personal jurisdiction over defendants who have "continuous and systematic" contacts with the forum state regardless of where the relevant conduct occurs, specific personal jurisdiction "requires only that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend itself in that state." CFA Inst. v. Inst. of Chartered Fin. Analysts of India, 551 F.3d 285, 292 n.15 (4th Cir. 2009). A court may exercise specific jurisdiction when the cause of action "arises out of the defendant's contacts with the forum." Saudi v. Northrop Grumman Corp., 427 F.3d 271, 276 (4th Cir. 2005). The determination of whether jurisdiction is appropriate depends on the facts and circumstances of each case. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478-79, 485-86 (1985).

When specific jurisdiction is asserted, jurisdiction must be established for each claim alleged. N.C. Mut. Life Ins. Co. v. McKinley Fin. Serv., Inc., 386 F. Supp. 2d 648, 656 (M.D.N.C. 2005) (citing Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004)); 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.7 (3d ed. 2002) ("Federal

13

Practice and Procedure") ("[I]t is important to remember that a plaintiff also must secure personal jurisdiction over a defendant with respect to each claim she asserts."). A court, however, may exercise "pendent personal jurisdiction" over any claim that arises out of a common nucleus of operative facts as the claim over which the court has personal jurisdiction. McKinley Fin., 386 F. Supp. 2d at 656 (citing 4A Federal Practice and Procedure § 1069.7).

### 2. Parties' Contentions

Jurisdictional Defendants have filed two declarations of James Sheer, who is an employee of Defendant Retail Management Services Corporation ("RMS"), a company providing management, accounting, and legal services to all Defendants. Sheer is also a vice president, assistant secretary, and controller of each of the Jurisdictional Defendants. (Doc. 19-1 ("Sheer Declaration"); Doc. 45-1 ("Sheer Supplemental Declaration"). According to Sheer, no Jurisdictional Defendant maintains an address, phone, or fax number or post office box in North Carolina, has sought or obtained authorization to do business in the state, has employees in the state, owns or leases property in the state, has a place of business or pays taxes in the state, or holds a license to do business in the state. (Doc. 19-1 ¶ 10.) The Sheer Declaration also represents that no

14

officer, agent or employee of the retail management service
provider or any of the Jurisdictional Defendants ever came to
North Carolina or discussed the subject matter of the action
with Pan-American or entered into an agreement with Pan-American
concerning the furniture design at issue. (Id. ¶ 9.)[5]

All Defendants are "commonly owned," but none has an
ownership interest in any of the other Defendants, and the
books, records and accounting for each Defendant are separately
and "rigorously maintained." (Id. ¶ 3.) For all practical
purposes,[6] the Jurisdictional Defendants are separate operating
companies with stores in non-overlapping geographic areas. (Id.
¶ 4.) While some Defendants operate regional merchandising
centers that provide warehouse and distribution services for
themselves and other nearby operating companies, Rooms to Go
North Carolina Corp. (a non-Jurisdictional Defendant) does not
operate such regional distribution center, and no Jurisdictional
Defendant purchased inventory to fill customer orders from that
entity. (Id. ¶¶ 5, 6.) None of the Jurisdictional Defendants
transacts retail business over the Internet; rather, all
Internet orders are filled by Roomstogo.com (a non-

---

[5] The court does not rely on this statement to the extent it states a
legal conclusion as to an agency relationship or the scope of the
alleged agreement.

[6] R.T.G. Furniture Corp of Texas is a general partner of a limited
partnership that is the operating company for Texas. (Doc. 19-1 ¶ 4.)

Jurisdictional Defendant).  (Id. ¶ 7.)  Nor, according to Sheer, does any Jurisdictional Defendant promote, sell, distribute, or display goods in North Carolina; rather, Roomstogo.com, Inc., Rooms to Go North Carolina Corp., and RTG Furniture Corp. of Georgia are the only Defendants to do so.  (Id. ¶ 8.)

Pan-American has filed the declaration of its President, Chris Anderson ("Anderson"), which states that all of Pan-American's operations are in North Carolina and that the damages alleged by the FAC "were suffered by Pan-American entirely within the State of North Carolina."  (Doc. 37 ¶ 3.)  With respect to his meetings and conversations with Bazarte and Seaman, Anderson states that "it was discussed and understood that the Rooms to Go representatives I was working with were acting on behalf of all of the Rooms to Go stores located throughout the country."  (Id. ¶ 4.)  Anderson states that "[i]t was clearly discussed and understood that the agreement relating to the Retro Collection . . . was for the sale of furniture in all of the Rooms to Go stores located throughout the United States" and that he "was told and understood that that [sic] Mr. Bazarte was authorized to act on behalf of all of the Rooms to Go stores . . . with regard to matters relating to the purchase and sale of furniture products to be manufactured pursuant to the Retro Collection designs."  (Id. ¶¶ 4, 5.)

16

Anderson also states that "Seaman is an officer in at least six of the Rooms to Go entities [sued] . . . including two of the [Jurisdictional] Defendants – Rooms to Go Tennessee Corp. and Rooms to Go Alabama Corp." (Id. ¶ 6.) He asserts that, contrary to Sheer's claims, "Rooms to Go regularly advertises throughout North Carolina," and he provides copies of Rooms to Go advertisements used in North Carolina newspapers that list stores in the Southeast region, including those of some of the Jurisdictional Defendants. (Id. ¶ 8; Doc. 37-1, Ex. A (copy of advertisement).) Anderson also notes that the Rooms to Go website shows a company history "which makes it clear that the company operates as a single enterprise." (Doc. 37 ¶ 9; Doc. 37-2, Ex. B (website printouts).) The website has a "store locater" function that allows users to search for products at particular locations, including stores operated by Jurisdictional Defendants, and provides contact information for retail locations. (Doc. 37 ¶ 9.)

Sheer responds that each operating company (including each Jurisdictional Defendant) determines which product lines to carry in its stores (with the operating company's individual retail stores making limited decisions), supplies its stores with items that other operating companies will never sell, and discontinues product lines based on customer preference in its

17

territory. (Doc. 45-1 ¶¶ 3, 4.) He also states that, contrary to the Anderson Declaration, decisions on which product lines to sell at stores are not "delegated to the buyers such as Mr. Bazarte." (Id. ¶ 3.) Sheer concedes that Rooms to Go advertising materials are used in newspapers but explains that they list all regional stores to eliminate the expense of customizing ads for a particular region; nevertheless, he states, each operating company is responsible for contracting with media outlets in its respective region. (Id. ¶ 5; Docs. 45-2 through 45-5, Exs. A-D (advertising contracts).) As to the common "Rooms to Go" name, Sheer points to the fact that franchises and chain stores commonly have separate companies "doing business" under a single name that use a common set of trademarks. (Id. ¶ 7.)

### 3. Discussion

Reduced to their common bases, Pan-American's arguments for specific jurisdiction rest on two separate legal theories: first, that Jurisdictional Defendants have purposefully availed themselves of the privilege of conducting business in North Carolina; and second, that they have committed an intentional tort directed at, and resulting in harm in, North Carolina (so-called "effects test"). Each will be addressed in turn.

#### a. Specific Personal Jurisdiction: Purposefully Conducting Activities in North Carolina

Pan-American argues that specific jurisdiction is proper under the three "factors" set out in Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004). The "factors" are actually a three-pronged test. Specific jurisdiction requires the court to determine: "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" ALS Scan, Inc. v. Digital Servs. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002). Each prong must be satisfied. Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278-79 (4th Cir. 2009).

The first prong of the test directs the court to consider "the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State." Id. at 278. The "purposeful availment" requirement ensures that "a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." Burger King, 471 U.S. at 475. If the defendant has created a "substantial connection" to the forum, then it has purposefully availed itself of the privilege of conducting business there. Ellicott Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474,

19

477 (4th Cir. 1993) (citing *Burger King*, 471 U.S. at 476); *see* *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997) (holding that "contacts related to the cause of action must create a 'substantial connection' with the forum state, although this connection need not be as extensive as is necessary for general jurisdiction" (citation omitted)).

Under this prong, the court considers factors including, but not limited to, the following: (1) whether the defendant maintains offices or agents in the forum state; (2) whether the defendant owns property in the forum state; (3) whether the defendant reached into the forum state to solicit or initiate business; (4) whether the defendant deliberately engaged in significant long-term business activities in the forum state; (5) whether the parties contractually agreed that the law of the forum state would govern disputes; (6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; (7) the nature, quality and extent of the parties' communications about the business being transacted; and (8) whether the performance of contractual duties was to occur within the forum. *Consulting Eng'rs*, 561 F.3d at 278.

It is uncontested that Jurisdictional Defendants do not maintain offices, own property, or have a registered agent in

North Carolina. Apart from the regional newspaper advertisements, there is no evidence that Jurisdiction Defendants, each of which operates in a specific state and none of which sells to the Rooms to Go entities doing business in North Carolina, solicit or initiate business in North Carolina as a general matter. The fact that all Defendants utilize the same advertising brochures, which list Rooms to Go stores in the southeast, is scant evidence of any Defendant actually soliciting business in North Carolina. There is no evidence that a North Carolinian would likely travel to and purchase a product from an out of state Rooms to Go store, much less because of such an advertisement. And although Pan-American asserts, without specifics, that it has entered into similar agreements with "Rooms to Go" in the past, it has provided no information as to any such arrangement and has not alleged that the Jurisdictional Defendants themselves have deliberately engaged in substantial long-term business activities in North Carolina.[7]

---

[7] Pan-American does contend that one of the Jurisdictional Defendants, R.T.G. Furniture Corp., admitted in De Coro USA, Ltd. v. R.T.G. Furniture Corp., Case No. 08-cv-122 (M.D.N.C. 2008), Docs. 1, 7, that it "conducted and continues to conduct business in" North Carolina. (Doc. 36 at 7.) In De Coro, both R.T.G. Furniture Corp. and its co-defendant, Rooms to Go North Carolina Corp., admitted this allegation in their joint answer and counterclaim. (Doc. 36-1.) Jurisdictional Defendants argue, without any authority, that R.T.G. Furniture Corp.'s consent to jurisdiction in that case related to a counterclaim and that it could not deny it was doing business in North Carolina because

As to the alleged contract, there is no allegation or evidence the parties agreed that it would be governed by the law of North Carolina. Nor has Pan-American alleged or provided any proof or forecast that Jurisdictional Defendants or their agents made an in-person contact with Pan-American in North Carolina. According to the FAC and the parties' declarations, all in-person contacts occurred outside North Carolina; namely, Pan-American's president traveled to Atlanta, Georgia, on numerous occasions and, either in person or through a representative, to Brazil to meet with Jurisdictional Defendants' alleged agents. (Doc. 23 ¶¶ 29, 31, 32; Doc. 45 at 5.) Thus, the first, second, third, fourth, fifth, and sixth factors cannot support a finding of specific jurisdiction over the Jurisdictional Defendants.

This leaves Pan-American's argument that jurisdiction is appropriate because of the nature, quality, and extent of the parties' communications about the business being transacted and because contractual duties were to be performed within the forum. Pan-American focuses on contacts related to the negotiation and terms of the alleged broker contract, with its assertions of "purposeful availment" resting on allegations that employees of some non-Jurisdictional Defendants acted as agents

---

it was litigating a breach of contract claim against a North Carolina company in North Carolina. (Doc. 45 at 2-3; see Doc. 47 at 8.) This is too thin a proposition upon which to find jurisdiction in this case.

of the Jurisdictional Defendants. It also points to contractual obligations it claims it would perform in the forum.

As Pan-American points out, specific jurisdiction can rest on a single contract performed in North Carolina. (Doc. 36 at 13 (citing Regent Lighting Corp. v. Galaxy Elec. Mfg., Inc., 933 F. Supp. 507, 511 (M.D.N.C. 1996)).) However, an in-state plaintiff's contract with an out-of-state defendant cannot alone automatically establish sufficient minimum contacts to warrant jurisdiction. Burger King, 471 U.S. at 478. Because a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction," the Supreme Court directs that "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [] must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." Id. at 479. In making this assessment, there must be a "substantial connection" between the contract and the state. Id. "[I]n the absence of a contract that is substantially connected to this state," visits to the state to negotiate a contract and telephone calls and faxes to the state during negotiations do not create specific personal jurisdiction. CEM Corp. v. Personal Chemistry AB, 192 F. Supp.

23

2d 438, 442 (W.D.N.C. 2002), aff'd, 55 F. App'x. 621 (4th Cir. 2003); see Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 452 (4th Cir. 2000) (finding no personal jurisdiction when the contract called for performance primarily outside the state even though some acts required of the defendant necessitated its contact with the forum). Additionally, the Fourth Circuit "has given great weight to the question of who initiated the contact between the parties." Worldwide Ins. Network, Inc. v. Trustway Ins. Agencies, LLC, No. 1:04CV00906, 2006 WL 288422, at *3 (M.D.N.C. Feb. 6, 2006) (citing Diamond Healthcare).

Here, the FAC is significant for what it does not say. Pan-American has not alleged that Jurisdictional Defendants, or their agents, initiated contact with Pan-American regarding the Retro Collection, despite this fact being within the direct knowledge of Pan-American. Rather, the FAC alleges only that "Chris Anderson met with Rooms to Go on a number of occasions in Atlanta, Georgia" (Doc. 23 ¶ 29), and that Rooms to Go "knew or learned during the course of these discussions that Pan-American was located in North Carolina." (Doc. 23 ¶ 30.) All indications therefore are that Pan-American initially contacted Rooms to Go in some place other than North Carolina, and Pan-American's briefing does not suggest otherwise.

Jurisdictional Defendants contend that the alleged contacts beyond the meetings in Georgia and Brazil were limited to telephone calls and emails, and Pan-American has not offered any evidence that such communications were numerous. (See Doc. 23 ¶¶ 29, 30; Doc. 29 at 7.) However, "the mere fact that emails, telephone calls, and faxes were employed does not, of itself, alter the minimum contacts analysis." Consulting Eng'rs, 561 F.3d at 279 n.5, 281 (four brief emails, several conversations, and the exchange of several contract drafts, and choice of law provision did not make out a prima facie showing of a sufficient jurisdictional basis); see CEM Corp., 192 F. Supp. 2d at 442. Here, the nature, quality, and extent of the parties' communications cannot be said to be substantially related to North Carolina. In fact, Pan-American cannot even represent the number of such communications or that the Jurisdictional Defendants directed them toward North Carolina. The overwhelming majority of the substantive communications took place outside North Carolina (in Georgia and Brazil), and this factor, despite a limited number of telephone calls and e-mails, cannot support Pan-American's argument for specific personal jurisdiction.

Pan-American alleges that "Rooms to Go either knew or learned during the course of these discussions that Pan-American

25

was located in North Carolina." (Doc. 23 ¶ 30.) It argues that, because of this, Defendants would have known that any resulting contract would be performed, at least in some measure, in North Carolina.[8] According to the FAC, the alleged contract contemplates Pan-American's performance of at least some brokerage services in North Carolina, although the bulk of the work is the brokering of contracts to manufacture furniture outside the United States. Pan-American also asserts that Jurisdictional Defendants knew that any contracts to manufacture furniture using Retro Collection designs would be routed through Greensboro, North Carolina.

---

[8] The FAC asserts personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4 without specifying applicable subsection(s). (See Doc. 23 ¶ 15.) Pan-American, in briefing, states that "the long-arm statute provides for broad jurisdiction over any defendant 'whose act or omission gave rise to an action claiming injury to a person or property in North Carolina.' N.C. Gen. Stat. § 1-75.4(1)(d) (2010)." (Doc. 36 at 8.) Pan-American appears to mean § 1-75.4(3), which applies only to injury to person or property (or wrongful death) arising out of an act or omission within North Carolina by a defendant, or to § 1-75.4(4), which applies to injury to person or property (or wrongful death) arising out of an act or omission outside the state but only in circumstances which may not be applicable in this case. The court notes that North Carolina's long-arm statute provides that personal jurisdiction exists in any action which "[a]rises out of . . . services actually performed for the defendant by the plaintiff within this State if such performance within this State was authorized or ratified by the defendant." N.C. Gen. Stat. § 1-75.4(5)(b). Section 1-75.4(5)(a) provides that personal jurisdiction reaches any action which "[a]rises out of a promise . . . by the defendant . . . to pay for services to be performed in this State by the plaintiff." N.C. Gen. Stat. § 1-75.4(5)(a). On its face, Section 1-75.4(5)(a), unlike Section 1-75.4(5)(b), does not require that services have been "actually performed" in North Carolina.

True, knowledge that a plaintiff will perform work in a forum may satisfy the purposeful availment requirement in combination with other factors. English & Smith v. Metzger, 901 F.2d 36, 39-40 (4th Cir. 1990) (finding jurisdiction where the defendant initiated contact with the plaintiff in Virginia, entered into contracts with the plaintiff by virtue of action taken in Virginia, and carried on a continuing relationship with the plaintiff in Virginia). There is an important distinction, however, between alleged contacts with a forum arising simply from a plaintiff's location and promise to perform some services there, on the one hand, and situations where a defendant has purposefully directed activities toward the state, on the other hand. For example, in Worldwide Insurance, the plaintiff was a North Carolina corporation that provided insurance and other financial products to independent insurance agencies in return for a share of the commissions the agencies earned. The court rejected an argument that personal jurisdiction existed in North Carolina, where the negotiations of contracts with carriers, accounting of commissions, preparation of marketing videos, writing of checks, and preparation of marketing videos were to occur, because the plaintiff had contacted the defendants in Georgia where all the defendants' work was to be performed. Worldwide Ins., 2006 WL 288422, at *5. And in Diamond

Healthcare, the Fourth Circuit rejected specific personal jurisdiction in Virginia on a contract claim where the parties had exchanged telephone calls and correspondence in Virginia but the contract was to be governed by the law of, and the majority of the performance was to occur in, Ohio. The court found significant that it was the plaintiff who initiated the contact and observed that crediting the plaintiff's argument that its performance was to be in the forum would only underscore the fact that its activities were actually directed outside the forum. Diamond Healthcare, 229 F.3d at 452. See Sea-Roy Corp. v. Parts R Parts, Inc., No. 9:94CV59, 1996 WL 557857, at *6 (M.D.N.C. July 30, 1996) ("[P]ersonal jurisdiction cannot be exercised over a foreign supplier who has no contact with the forum other than being solicited to contract by an individual in the forum."); Sloane v. Laliberte, No. 1:08-cv-381, 2011 WL 2938117, at *9 (M.D.N.C. July 19, 2011) ("An agreement coupled with a plaintiff's performance of some contractual obligations in the forum do not show sufficient contacts by the defendant with the forum."), recommendation adopted, No. 1:08-cv-381 (M.D.N.C. Sept. 15, 2011), Doc. 57.

Here, Pan-American has failed to allege the presence of sufficient factors other than its mere presence in the forum to warrant purposeful availment. The reality is that Pan-American

initiated the alleged contract outside the forum, and its brokering of furniture-making – the essence of the contract – was contemplated to occur outside the forum. Pan-American therefore falls short of making a prima facie showing that Jurisdictional Defendants purposefully availed themselves of the privilege of conducting business in North Carolina, whether directly or through agents. Because Pan-American has not satisfied this requirement, the court need not address the remaining two factors, and specific personal jurisdiction over the Jurisdictional Defendants cannot rest on this theory.

### b. Specific Personal Jurisdiction: "Effects Test"

In the alternative, Pan-American argues that personal jurisdiction is appropriate under the "effects test" set out in Calder v. Jones, 465 U.S. 783 (1984). (Doc. 36 at 15.) Under the effects test, a court "may exercise [personal] jurisdiction over a non-resident defendant who is a 'primary participant[] in an alleged wrongdoing intentionally directed' at a resident in the forum state." AARP v. Am. Family Prepaid Legal Corp., 604 F. Supp. 2d 785, 799 (M.D.N.C. 2009). The test has three prongs: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in a forum that can be said to be the focal point of the harm; and (3) the defendant expressly aimed tortious conduct at the forum in a manner that

29

the forum can be said to be the focal point of it. Consulting Eng'rs, 561 F.3d at 280. Pan-American bases its Calder argument on its assertion that copyright infringement is an intentional tort.

Copyright infringement has been described by the Fourth Circuit as an "intentional tort." Gnossos Music v. Mitken, Inc., 653 F.2d 117, 120 (4th Cir. 1981) (stating that "copyright infringement is a tortious interference with a property right for which Congress created the remedy for damages"); Teletronics Int'l, Inc. v. CNA Ins. Co./Transp. Ins. Co., 120 F. App'x 440, 443 n.3 (4th Cir. 2005) (per curiam). But see 5 William F. Patry, Patry on Copyright § 17:167 (criticizing view as applied in the Calder analysis as inconsistent with copyright being a strict liability tort) ("Patry on Copyright"). Therefore, the court will consider the first prong of Calder satisfied to the extent Pan-American's argument is based on copyright infringement.

As to the second prong, Pan-American acknowledges that copyright infringement usually occurs where the tortfeasor sells the infringing content. Dash v. Mayweather, No. 3:10-1036-JFA, 2010 WL 3420225 (D.S.C. Aug. 25, 2010) (finding personal jurisdiction in South Carolina where defendant promoter directed playing of infringing music on national broadcast) (citing

30

Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1570 (Fed. Cir. 1994) (place of injury is where patent infringement occurs)). Because that would be some place other than North Carolina for the Jurisdictional Defendants, Pan-American cites as its alleged harm the failure to use it as broker and the commissions it failed to collect in North Carolina because of breach of the alleged broker contract.[9] (Doc. 36 at 15-16.) But that is a contract damage, not a harm tied to the underlying "tort" of copyright infringement.

As to the third prong, Pan-American points to Jurisdictional Defendants' advertisement and promotion of Rooms to Go Chaplin Collection products in North Carolina which allegedly infringe the Retro Collection design, and on alleged misrepresentations to obtain copies of the Retro Collection designs. (Doc. 36 at 16.) But neither of these passes muster. The advertising is insufficient for the reasons noted previously and because each Defendant contracts and pays for publication of the newspaper advertisements in its own territory, and no other. (Doc. 45-1 ¶ 5.) Thus, Jurisdictional Defendants could not be said to be aiming advertising and promotion, tortious or otherwise, at North Carolina. As to the alleged

---

[9] That this harm relates to the contract claim is underscored by Pan-American's briefing to oppose Defendants' motion to dismiss, where Pan-American cited Defendants' alleged breach of contract for failure to use it as a broker to distinguish its copyright infringement claim and thus avoid preemption. (Doc. 39 at 7.)

misrepresentations, Pan-American does not argue the point beyond a conclusory statement and fails to indicate if the alleged misrepresentations were made to Pan-American in North Carolina or during the alleged negotiations, much or all of which occurred outside North Carolina. The FAC, taken in the light most favorable to Pan-American, does not support this conclusory statement.

To be sure, the mere presence of a plaintiff's business headquarters in a forum will not support personal jurisdiction unless it is "accompanied by the defendant's own contacts with the state." ESAB, 126 F.3d at 626. Otherwise, "jurisdiction would depend on a *plaintiff's* decision about where to establish residence." Id. (noting that if a plaintiff's mere presence in the forum state were enough, such a theory "would always make jurisdiction appropriate in a plaintiff's home state, for the plaintiff *always* feels the impact of the harm there"). In the end, this case is similar to Ottenheimer Publishers, Inc. v. Playmore, Inc., 158 F. Supp. 2d 649 (D. Md. 2001), where the court considered plaintiff's argument that because copyright infringement constitutes an intentional tort, the "effects" are necessarily felt at the plaintiff's principal place of business. Id. at 653. This argument, the court concluded, "stretches Calder beyond the limits of the Constitution." Id. Like here,

the court found that even if the defendant's acts were intentional and tortious, the plaintiff had "failed to demonstrate that [the defendant's] behavior satisfies the other two jurisdictional requirements outlined in Calder." Id. Even the selection of Maryland as governing law in license agreements, the receipt of payments in Maryland for copyrighted material, and the presence of a website which customers could access in Maryland were insufficient to create jurisdiction over the defendant. See Ottenheimer Publishers, 158 F. Supp. 2d at 654. The facts here do not even rise to the level of those found to be insufficient in Ottenheimer Publishers.

In light of the foregoing, the court finds that Pan-American has failed to make a prima facie showing of personal jurisdiction under the effects test.

### B. Motion in the Alternative for Discovery

Should the court find that Pan-American has failed to make out a prima facie case for specific personal jurisdiction, Pan-American requests permission to seek discovery on the following topics:

> 1. [T]he operation and management of the various Rooms to Go Defendants, including the delegation of authority by the [Jurisdictional] Defendants with regard to the selection of furniture to purchase and sell in the Rooms to Go stores;

2. [T]he process by which the Jurisdictional Defendants decided to purchase and sell the infringing Chaplin Collection in the stores they operated;

3. [T]he advertising and promotion of the [Jurisdictional] Defendants' Rooms to Go stores and products in North Carolina;

4. [T]he contacts and visits to North Carolina by the [Jurisdictional] Defendants or their agents;

5. [T]he internal chain of title with regard to the infringing furniture products and the internal division of profits resulting from the sale of such furniture products;

6. [M]atters relating to Pan-American's allegations that the Rooms to Go entities are "alter egos" of each other; and

7. [C]ommunications between the [Jurisdictional] Defendants and their agents with Pan-American generally and the extent of their knowledge regarding Pan-American's location.

(Doc. 34 at 3.)

Whether to grant discovery on the question of personal jurisdiction lies in the discretion of the court. Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396, 402-03 (4th Cir. 2003); see Howard Acquisions, LLC v. Giannasca New Orleans, LLC, No. WDQ-09-2651, 2010 WL 889551, at *7 (D. Md. Mar. 5, 2010) (allowing limited discovery of jurisdictional facts where party failed to make a prima facie showing of jurisdiction); Avanti Hearth Prods., LLC v. Janifast,

34

_Inc._, No. 3:10-cv-19-FDW, 2010 WL 3081371, at *4-5 (W.D.N.C. Aug. 6, 2010) (denying motion to dismiss on alter ego theory). A plaintiff must offer more than speculation or conclusory assertions about contacts with a forum state. _Carefirst of Md._, 334 F.3d at 402-03 (finding district court was within its discretion in deciding plaintiff failed to establish jurisdictional discovery warranted after failing to make a prima facie case); _Rich v. KIS Cal., Inc._, 121 F.R.D. 254, 259 (M.D.N.C. 1988) ("[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery confined to issues of personal jurisdiction should it conclude that such discovery will be a fishing expedition.").

Insofar as Pan-American's request for discovery relates to the grounds for personal jurisdiction the court has just addressed, it will be denied. Pan-American has had sufficient opportunity to demonstrate those bases for personal jurisdiction, and they fail for the reasons noted. There is no showing that additional discovery is likely to reveal facts that would change this result.

The FAC also alleges, however, that Defendants are alter egos of each other. Pan-American argues that should the court

find it has not made out a prima facie case on its other grounds, it has adduced sufficient evidence at this stage to warrant further discovery to establish "that the Rooms to Go entities are 'alter egos' of one another such that the contacts of one entity can be attributed to the others." (Doc. 35 at 11.) Because the five non-Jurisdictional Defendants do not oppose the exercise of general jurisdiction over them,[10] Pan-American contends, the court should have jurisdiction over the remaining (Jurisdictional) Defendants if the former are their alter egos. Jurisdictional Defendants deny that sufficient facts exist to support these contentions. (Doc. 29 at 8.)

It is generally the case that the contacts of a corporate affiliate cannot impute jurisdiction to another, such as a parent entity. Northrop Grumman, 427 F.3d at 276. When a plaintiff seeks personal jurisdiction based on the actions of an affiliate, it must make a showing approaching that necessary under traditional alter-ego analysis. Manley v. Air Can., 753 F. Supp. 2d 551, 558-59 (E.D.N.C. 2010); see Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 433-34 (4th Cir. 2011) (district court made sufficient findings to establish personal jurisdiction as part of its analysis

---

[10]   The non-Jurisdictional Defendants are said to be corporations registered with the State of North Carolina Secretary of State (Doc. 36 at 2), a fact not disputed by Jurisdictional Defendants.

regarding piercing the corporate veil (citing cases)). However, the test for alter ego for jurisdictional purposes is generally recognized to be somewhat less stringent than that necessary to impose liability. Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir 1981) (requiring demonstration of either a shell corporation, or fraud, but not both).

Under North Carolina law, for example, a defendant qualifies as an alter ego of another defendant when the plaintiff establishes three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time *no separate mind, will or existence of its own;* and (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. . . .

> While the plaintiff carries a heaving burden when attempting to pierce the corporate veil to establish personal jurisdiction, North Carolina courts recognize the equitable nature of alter ego theory; as a result, they do not focus on the presence or absence of a particular factor, but instead apply the doctrine flexibly to avoid injustice.

Avanti Hearth, 2010 WL 3081371, at *4-5 (citing Atl. Tobacco Co. v. Honeycutt, 101 N.C. App. 160, 165, 398 S.E.2d 641, 643 (1990), for the latter statement); AARP, 604 F. Supp. 2d at 804

n.16 (noting North Carolina's "mere instrumentality rule"). Factors to examine include inadequate capitalization, non-compliance with corporate formalities, complete dominion and control so that it has no independent identity, and excessive fragmentation of a single enterprise into separate corporations. Glenn v. Wagner, 313 N.C. 450, 455, 329 S.E.2d 326, 330-31 (1985). Where "some semblance of independence" is preserved, general jurisdiction over the affiliate is improper. Ash v. Burnham Corp., 80 N.C. App. 459, 462, 343 S.E.2d 2, 4 (1986) (parent-subsidiary context), aff'd, 318 N.C. 504, 349 S.E.2d 579 (1986). While the doctrine is frequently applied in the parent/subsidiary context, it has also been applied where the affiliates share common ownership. Glenn, 313 N.C. at 457, 329 S.E.2d at 331-32 (affirming trial court's disregard of corporate entities involving affiliated companies even though analysis was not limited to the specific transaction in question). Therefore, "if the [affiliate] is merely an agent through which the [foreign] company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the [in-forum affiliate's] business will be viewed as that of the [foreign corporation] and the latter will be said to be doing business in the jurisdiction through the [affiliate] for purposes of

38

asserting personal jurisdiction." Manley, 753 F. Supp. 2d at 559 (alteration in original) (quoting 4A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.4, at 174 (3d ed. 2002)); see Sigros v. Walt Disney World Co., 129 F. Supp. 2d 56, 70 (D. Mass. 2001) ("Jurisdiction over HRC will lie, then, only if the activities of HRC are confusingly intermingled with those of Disney so as to warrant imputing the established contacts between Disney/WDA and Massachusetts to HRC itself.").

The "[a]pplication of the [alter ego] doctrine must be exercised reluctantly and cautiously. It is not enough that the stock in two corporations is held by the same individuals and that those two corporations share the same officers and directors." DP Envtl. Servcs., Inc. v. Bertlesen, 834 F. Supp. 162, 165-66 (M.D.N.C. 1993) (internal citations omitted); Becker v. Graber Builders, Inc., 149 N.C. App. 787, 790-91, 561 S.E.2d 905, 908-09 (2002) (citing Glenn, 313 N.C. at 455, 329 S.E.2d at 330); see also United States v. Greer, 383 F. Supp. 2d 861, 867 (W.D.N.C. 2005) (quoting Becker), aff'd, 182 F. App'x 198 (4th Cir. 2006). Nor does "the mere fact that a web site describes 'a network of affiliated companies' and individuals" justify asserting personal jurisdiction. WLC, LLC v. Watkins, 454 F. Supp. 2d 426, 434 (M.D.N.C. 2006). There must be a showing that

"the businesses are parts of the same whole." <u>Wyatt v. Walt</u> <u>Disney World Co.</u>, 151 N.C. App. 158, 168, 565 S.E.2d 705, 711 (2002).

The facts, viewed in the light most favorable to Pan-American, demonstrate the following. Jurisdictional Defendants admit that Defendants are commonly owned. (Doc. 29 at 2.) All Defendants also share common officers and employees. For example, Sheer is Vice President and Assistant Secretary of each Defendant, and he acts as Controller for each of them. (Doc. 19-1 ¶ 2.) Sheer also provides management services to all Defendants through Defendant Retail Management Services Corp. According to Pan-American's President, Seaman is an officer in at least six of the Defendants, including two of the Jurisdictional Defendants. (Doc. 37 ¶ 6.) There is evidence that Defendants share common newspaper advertising, including advertisements in North Carolina that list the stores of many, but not all, of Defendants' Rooms to Go stores outside North Carolina. (<u>Id.</u> Ex. A (listing Tennessee and Alabama stores in North Carolina advertisement).) Defendants also utilize a common "Rooms to Go" website that describes the stores as a common enterprise. And, at least one Jurisdictional Defendant and one non-Jurisdictional Defendant have described themselves as "members of a family of businesses collectively doing

business at 'Rooms to Go.'" Answer and Counterclaim, at 9, De Coro USA, Ltd. v. R.T.G. Furniture Corp., Case No. 08-cv-122 (M.D.N.C. Apr. 1, 2008), Doc. 7. According to Pan-American's President, "Rooms to Go's" Bazarte and Seaman represented that they negotiated the broker contract with him on behalf of all Defendants. (Doc. 37 ¶ 4.) Courts have also noted that it is relevant that all entities alleged to be separate are nevertheless represented by the same counsel. Avanti Hearth, 2010 WL 3081371, at *5. That is the case here, as all ten Defendants share one law firm.

The court finds that these facts, construed in the light most favorable to Plaintiff, warrant granting Pan-American's request for jurisdictional discovery on its theory that the court should disregard the corporate formalities in order to treat the acts of those Defendants over which the court has general jurisdiction as the acts of the Jurisdictional Defendants. See, e.g., Dellinger Unlimited, LLC v. Caterpillar, Inc., No. 1:10CV390, 2010 WL 4026143, at *2 (M.D.N.C. Oct. 13, 2010) (Dixon, Mag. J.) (permitting jurisdictional discovery on plaintiff's "piercing the corporate veil argument" when plaintiff contended that all of the defendant's contact information and principal place of business was the same as its subsidiaries, the subsidiaries shared essentially the same

41

office of defendant, defendant wholly owned its subsidiaries showing defendant is an integrated network owning and operating commercial facilities in eleven states, including North Carolina); Avanti Hearth, 2010 WL 3081371, at *5 (finding that a prima facie showing based on evidence of sharing of employees and assets, exchange of debt for stock, same principal place of business, common officers and directors, and defendant website "all counsel in favor of finding a close relationship" between defendants such that court was "reluctant to dismiss [the defendant] from the case").

The court finds, therefore, that Pan-American has failed to demonstrate a prima facie case of personal jurisdiction over the non-Jurisdictional Defendants, but it will permit Pan-American to conduct limited jurisdictional discovery as to its alter ego theory (item 6 on its list of discovery topics).[11]

_____

[11] If the matter is returned to the court for consideration after discovery, the parties should address the determination of applicable law (North Carolina substantive law or substantive law determined under North Carolina's choice of law rules) or whether the choice makes a difference to the analysis. See Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F. Supp. 345, 349 (M.D.N.C. 1995) (opining that "if the North Carolina Supreme Court were faced with a choice of law question for piercing the corporate veil, it would adopt the internal affairs doctrine and apply the law of the state of incorporation"); Strategic Outsourcing, Inc. v. Stacks, 176 N.C. App. 247, 252-53, 625 S.E.2d 800, 804 (2006) (concluding that "this unresolved choice-of-law issue, while important, need not be decided here, as it has not been adequately briefed by the parties and does not affect the outcome of this case").

Jurisdictional Defendants may renew their motion to dismiss on this remaining ground at the completion of that discovery.

## III. MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Because the court has not yet determined whether it has personal jurisdiction over the Jurisdictional Defendants, it will not consider their Rule 12(b)(6) motion at this time. E.g., Howard Acquisitions, 2010 WL 889551, at *7 (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1351 (3d ed. 2004)). There is no just reason for not addressing the motion to dismiss with respect to the non-Jurisdictional Defendants, however, particularly in light of the full briefing by the parties. So, the remaining discussion relates solely to the motion to dismiss by the non-Jurisdictional Defendants.

Defendants assert that Pan-American's state law claims for breach of contract, unjust enrichment, unfair competition, and unfair and deceptive trade practices are preempted by section 301 of the Copyright Act (17 U.S.C. § 301). Defendants also assert that Pan-American's copyright claims fail to state a claim upon which relief can be granted because the copyrights are facially invalid but, if found to be valid, have not been infringed by Defendants.

43

**A.    Standard for Rule 12(b)(6) Motions**

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). This requirement applies only to facts, not legal conclusions, however.    Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009).

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although the complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," a plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).

44

Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Id. at 555, 570; see Iqbal, 129 S. Ct. at 1949-51. Under Iqbal, the court is to undertake a two-step analysis. First, it separates factual allegations from allegations not entitled to the assumption of truth (i.e., conclusory allegations, bare assertions amounting to nothing more than a "formulaic recitation of the elements"). Second, it determines whether the factual allegations, which are accepted as true, "plausibly suggest an entitlement to relief." 129 S. Ct. at 1950-01.

**B.    Preemption**

Through its authority under the Supremacy Clause, U.S. Const. art. VI, cl. 2, Congress has preempted all state law rights that are equivalent to those protected under federal copyright law. See 17 U.S.C. § 301(a). Section 301(a) of the Copyright Act provides that

> all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright . . . are governed exclusively by this title. . . .  [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

45

_Id._  Thus, a state law claim is preempted if (1) the work is "within the subject matter of copyright" and (2) the state law creates "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright." _Id._; see United States _ex rel._ Berge v. Bd. of Trustees of the Univ. of Ala., 104 F.3d 1453, 1463 (4th Cir. 1997); Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225, 229 (4th Cir. 1993) (preempting Virginia Computer Crimes Act claim).  The scope of section 301(a) is extensive, such that the "shadow actually cast by the [Copyright] Act's preemption is notably broader than the wing of its protection."  Berge, 104 F.3d at 1463.

### 1.  Subject Matter of Copyright

Pan-American claims to have a valid copyright in the design allegedly incorporated into Defendants' furniture.  (Doc. 23 ¶¶ 43-46; see Doc. 39 at 4.)  Although Defendants dispute the validity of Pan-American's copyright and its infringement claims, each state law claim relates to Pan-American's designs which were fixed in a tangible medium of expression under § 102(a) and are thus within the subject matter of copyright as set out in § 301(a).  See Berge, 104 F.3d at 1463.  Thus, for

purposes of the preemption analysis, the first requirement has been satisfied generally with respect to all state law claims.[12]

### 2.  Equivalent Rights

The parties dispute — and the question to be answered is — whether Pan-American's state law claims of breach of contract, unjust enrichment, unfair competition, and unfair or deceptive trade practices satisfy the second requirement by creating legal or equitable rights that are not "equivalent to" the rights protected under federal copyright law.  The Copyright Act, 17 U.S.C. § 106, grants a copyright owner the exclusive right to "(1) reproduce the work, (2) prepare derivative works based on the work, (3) distribute copies of the work, (4) perform the work publicly, and (5) display the work publicly." <u>Trandes Corp. v. Guy F. Atkinson Co.</u>, 996 F.2d 655, 659 (4th Cir. 1993). To ascertain if the equivalency requirement is satisfied, the Fourth Circuit applies the "extra element" test:

> State-law claims that infringe one of the exclusive rights contained in § 106 are preempted by § 301(a) if the right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights. . . .  However, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of

---

[12]   To the extent Pan-American contends that its breach of contract claim falls outside the subject matter of the Copyright Act under Fourth Circuit law (Doc. 39 at 9), this contention is addressed in part <u>infra</u> note 15 but is ultimately moot because the court finds that the contract rights are not equivalent to those protected under the Copyright Act.

> action, . . . there is no preemption, provided that
> the extra element changes the nature of the action so
> that it is *qualitatively* different from a copyright
> infringement claim.

Rosciszewski, 1 F.3d at 229-30 (internal citations and quotations omitted). In short, the Copyright Act preempts state law claims that lack an extra element which would make them "*qualitatively* different from a copyright infringement claim." Id. at 230 (internal quotation marks and citation omitted).

In applying the extra element test, the Fourth Circuit has declared that courts should compare the "required" or "necessary" legal elements of the respective causes of action. Rosciszewski, 1 F.3d at 229-30; Trandes Corp., 996 F.2d at 659-60; see Iconbazaar, L.L.C. v. America Online, Inc., 308 F. Supp. 2d 630, 637 (M.D.N.C. 2004). The court has cautioned, however, that "[t]o determine whether a particular cause of action involves rights equivalent to those set forth in § 106, the elements of the causes of action should be compared, not the facts pled to prove them." Trandes Corp., 996 F.2d at 659 (characterizing the analysis of alleged conduct as the "wrong approach").

"Despite setting forth these standards, even the Fourth Circuit has on occasion found that determining equivalency solely through the application of the formalistic 'required' elements analysis is sometimes easier said than done. . . . In

order to determine whether the state law cause of action differs qualitatively from a Copyright Act claim, the ultimate touchstone of the statute, the court has reverted to examining the allegations underlying the state law cause of action." Rutledge v. High Point Reg'l Health Sys., 558 F. Supp. 2d 611, 618 (M.D.N.C. 2008) (citing Berge, 104 F.3d at 1463, Rosciszewski, 1 F.3d at 230, and Fourth Circuit district court opinions)); see Thomas v. Artino, 723 F. Supp. 2d 822, 835 (D. Md. 2010) ("Some consideration of the specific allegations in each case is necessary for preemption analysis, however, in order to establish and then to compare the elements of the state law cause of action asserted with the rights created by the [Federal Copyright Act]." (citing Berge 104 F.3d at 1463)); see also Stromback v. New Line Cinema, 384 F.3d 283, 303-06 (6th Cir. 2004).

### 3. State Law Claims

#### a. Breach of Contract

Pan-American claims breach of contract based upon its assertion that it contracted with Defendants to provide copies of the Retro Collection designs (as well as furniture samples) in exchange for Defendants' agreement to use Pan-American to broker the purchase of furniture incorporating such designs, thus allowing Pan-American to be paid by the manufacturer.

49

(Doc. 23 ¶ 55.) Pan-American alleges it would not have revealed the designs had Defendants not agreed to use it as broker for any purchases and that Defendants breached the contract by not using it as broker when arranging to have such furniture manufactured. (Id. ¶¶ 56, 57.)

Defendants argue that Pan-American's complaint "simply claims that Defendants violated the copyright owner's exclusive rights to reproduce the protected works, create derivative works and to control the terms under which others" may exercise those rights. (Doc. 31 at 9.) Pan-American, Defendants assert, attempts to avoid preemption by "merely avoiding the use of the language of § 106 while alleging what would clearly be violations of § 106 exclusive rights." (Id.) Defendants assert that any extra element in Pan-American's breach of contract claim does not change the nature of the action and that the acts alleged in the FAC (particularly that Pan-American was to act as broker) fall under those exclusive rights. Defendants conclude that Pan-American's claim is preempted because it is merely a statement of the conditions under which it would have authorized Defendants to use its designs and is therefore not qualitatively different from an infringement claim. (Doc. 44 at 2-3.)

Pan-American argues that the breach of contract alleged is premised on Defendants' failure to use it as a broker, not on

their use of copyrighted items. (Doc. 39 at 7.) Citing Acorn Structures, Inc. v. Swantz, 846 F.2d 923 (4th Cir. 1988),[13] Pan-American argues that, similar to the situation in Acorn Structures, the contract in this case did not obligate Defendants to sell furniture using the Retro Collection designs but provided that if that decision was made, Defendants agreed to use Pan-American as its broker. As a result, Pan-American concludes, its breach of contract claim does not arise out of the subject matter of copyright, is not "equivalent" to the copyright rights, and thus is not preempted. (Doc. 39 at 7-9.)

To establish a breach of contract under North Carolina law, a plaintiff must show the existence of a valid contract and a breach of it. Long v. Long, 160 N.C. App. 664, 668, 588 S.E.2d 1, 4 (2003). The circuit courts of appeal are divided with respect to whether a contractual promise constitutes an extra element for copyright preemption purposes. See, e.g., Canal+ Image UK Ltd. v. Lutvak, 773 F. Supp. 2d 419, 442 n.5 (S.D.N.Y. 2011) (citing the Sixth and Ninth Circuits for finding contract claims preempted, particularly where contract rights are identical to or derivative of rights conferred by the Copyright Act; citing the Fifth, Seventh, Eighth, and Eleventh Circuits as well as the Fourth Circuit in Acorn Structures as endorsing the

---

[13] Pan-American cites this case as "Acorn Structures, Inc. v. Am. Inst. of Architects." (Doc. 39 at 6, 7.)

view that a promise is an "extra element"); cf. 5 Patry on Copyright § 18:25 (2011) ("The most difficult preemption problems are those involving breach of contract.").

In Acorn Structures, the defendant signed an agreement under which the plaintiff would design a house and the defendant would either purchase the house as designed or return the drawings to the plaintiff. 846 F.2d at 925. The defendant provided the plans to another architect who built the house for the defendant, but the defendant did not return the drawings. Id. The Fourth Circuit found that the defendant's delivery of the plans to a third party to build the house was not part of a § 106 action and held that plaintiff's breach of contract claim was not preempted because the contract did not require the defendant to use the designs but rather required that if he did, he purchase them from the plaintiff. In reaching this conclusion, the Fourth Circuit found that the plaintiff's "claim for breach of contract entails a distinct cause of action which is clearly not within the subject matter of copyright." Id. at 926.[14]

_____

[14] Defendants claim that Pan-American's reliance on Acorn Structures is misplaced because at the time of the 1988 opinion the "subject matter of copyright" did not extend to the architectural works at issue in that case (a building), a right not extended until the Architectural Works Copyright Protection Act of 1990. Because buildings were not covered by §§ 102 and 103, it argues, they were not subject to preemption under § 301. (Doc. 39 at 3; Doc. 44 at 3-4.) This raises an interesting point in light of the Fourth Circuit's focus on the

Cases in which courts have found a breach of contract claim to be preempted are distinguishable. Although the vast majority of contract claims will not be preempted under the Copyright Act, courts must examine the precise contract right being asserted. Madison River Mgt. Co. v. Business Mgt. Software Corp., 351 F. Supp. 2d 436, 443 (M.D.N.C. 2005). For example, in Nichols Agency, Inc. v. Enchanted Child Care, Inc., 537 F. Supp. 2d 774, 783-84 (D. Md. 2008), the court found that a contract provision that "[a]fter termination of this agreement [the defendant] shall have no further right to use, reproduce, distribute, display or modify any Agency Works" without the

---

"subject matter" issue rather than the question of equivalent rights. Other circuit courts recognizing contract claims have done so typically by finding an extra (or additional) element in the contract claim. E.g., Taquino v. Teledyne Monarch Rubber, 893 F.2d 1488, 1501 (5th Cir. 1990). Despite the "subject matter" language in Acorn Structures, courts have viewed the holding as including the extra element prong. See ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1454 (7th Cir. 1996) (agreeing with Acorn Structures and other circuit courts holding contract rights not to be "equivalent to any of the exclusive rights within the general scope of copyright"); U.S. South Comm'ns, Inc. v. N. Telecom, Inc., No. 3:07CV186-C, 2007 WL 2021802, *5 (W.D.N.C. July 9, 2007) ("Fourth Circuit [in Acorn Structures] found this 'extra element' in a breach of contract claim."); Frontline Test Equip., Inc. v. Greenleaf Software, Inc., 10 F. Supp. 2d 583, 593 (W.D. Va. 1998) (referring to "[t]he Fourth Circuit's careful analysis of the added element in the Acorn claim"). Although citing Acorn Structures in a few subsequent opinions, the Fourth Circuit has not done so with respect to copyright preemption of a contract and, therefore, has not clarified its discussion of "subject matter." Subsequent to the 1990 Copyright Act amendments, however, Fourth Circuit district courts continue to follow, or distinguish, Acorn Structures in a variety of breach of contract scenarios. This court's resolution of Defendants' preemption challenge to Pan-American's breach of contract claim, infra, is consistent with Acorn Structures and subsequent district court opinions.

plaintiff's consent did not provide the type of "implicit provisions or private law" found in Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737 (D. Md. 2003), or Acorn Structures. In other words, the breach of contract claim for use of the design after expiration of the contract without permission was not qualitatively different from use of copyrighted material without permission generally.

In Madison River, the district court found one of the counterclaim plaintiff's breach of contract claims against a software licensee preempted because it was not based on a failure to pay but rather on the daily copying of the plaintiff's software program. 351 F. Supp. 2d at 443 (breach of contract claims preempted because all "emanate[d] from the alleged wrongful reproduction and distribution of" counterclaim plaintiff's copyrighted work). The court, in a subsequent opinion in the case, however, held that an express promise to pay for excess use was not preempted, finding that it provided an extra element. Madison River Mgt. Co. v. Business Mgt. Software Corp., 387 F. Supp. 2d 521, 541-43 (M.D.N.C. 2005); see Lowry's Reports, 271 F. Supp. 2d at 756-57 (holding that a claim based on a subscription agreement prohibiting dissemination of stock reports without consent was not preempted because it "establish[ed] a private law governing fair use of the

copyrighted works"); Oce N. Am., Inc. v. MCS Servs., Inc., 748
F. Supp. 2d 481, 490 (D. Md. 2010) (distinguishing Lowry's
Reports, holding a claim for breach of contract preempted where
the defendant used the plaintiff's software on more computers
than those for which payment was promised).

In this case, Pan-American's breach of contract claim
tracts that found not to be preempted in Acorn Structures. Pan-
American bases its claim on Defendants' alleged failure to pay
broker fees when it used Pan-American's designs; the claim is
not merely that Defendants used Pan-American's designs without
its permission. The alleged broker provisions are qualitatively
different from Pan-American's rights under the Copyright Act.
As a result, Pan-American's contract claim contains an extra
element that is qualitatively different from the rights afforded
by the Copyright Act and is not preempted. Defendants' motion
to dismiss in this regard will be denied.

### b.  Unjust Enrichment

Pan-American's unjust enrichment claim is premised on the
Defendants' alleged inducement of Pan-American to reveal the
Retro Collection designs by representing it would use Pan-
American as a broker. By reason of that conduct, Pan-American
concludes, "Rooms to Go and/or its agents have been unjustly
enriched at Pan-American's expense." (Doc. 23 ¶ 60.) Pan-

American also asserts that Rooms to Go obtained substantial profits and benefits "without providing any amounts that should have been paid for the use of the Retro Collection designs." (Id. ¶ 61.) It concludes that "[a]ll profits and other benefits that have been received by Rooms to Go from advertising, distributing, and selling articles made pursuant to the Retro Collection designs are now due and owing to Pan-Americans [sic] as a remedy for the claims alleged herein." (Id. ¶ 62.)

Defendants argue that Pan-American's unjust enrichment claim "is a copyright claim in state law clothing," particularly in light of the demand for Defendants' profits, a remedy provided for copyright infringement by 17 U.S.C. § 504(b). (Doc. 31 at 9-10.) Defendants also characterize the allegations (paragraphs 60 and 61 of the FAC) as only claimed violations of section 106's grant of exclusive rights to display, reproduce, distribute, and create derivative works and argue, therefore, that the related claim should be preempted. (Id. at 10.)

In contrast, Pan-American argues that its unjust enrichment claim requires the extra elements of proof that plaintiff conferred a benefit on defendant, which defendant accepted, and the benefit was not conferred gratuitously -- elements which are not required in order to prevail on a claim of copyright infringement. (Doc. 39 at 9.) Pan-American asserts that its

unjust enrichment claim is based not upon Defendants' use of its designs but rather on Rooms to Go's failure to use it as a broker, for which it is entitled to recover the reasonable value of its services, which it argues in its brief (but does not allege in its complaint) is the commission it would have earned had it been used as a broker. (Id. at 9-10 (citing Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988)).)

Under North Carolina law, a plaintiff asserting an unjust enrichment claim must show it conferred a benefit on another, the other party consciously accepted that benefit, and the benefit was not conferred gratuitously. Southeastern Shelter Corp. v. BTU, Inc., 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002). A claim for unjust enrichment is neither in tort nor in contract but is a claim in quasi-contract or contract implied in law, which is not based on a promise but is imposed by law to prevent unjust enrichment. Booe, 322 N.C. at 570, 369 S.E.2d at 556 (measure of damages is the reasonable value of the goods and services to the defendant). "[A] state law cause of action for unjust enrichment or quasi contract should be regarded as an 'equivalent right' and hence, pre-empted insofar as it applies to copyright subject matter." 1-1 Nimmer on Copyright § 1.01[B][1][g] (footnotes omitted). However, a plaintiff's claim "may survive a preemption challenge if plaintiffs [can]

57

demonstrate that defendants were unjustly enriched by 'material beyond copyright protection.'" <u>Microstrategy, Inc. v. Netsolve, Inc.</u>, 368 F. Supp. 2d 533, 537 (E.D. Va. 2005).

Although Pan-American asserts that Defendants induced it to reveal its designs by representing that Defendants would use Pan-American as a broker, there is no qualitative difference between its unjust enrichment claim and a copyright infringement claim. The central allegation is that Defendants used the copyrighted designs, through advertising, distribution and sales, and were enriched thereby. Indeed, Pan-American seeks to recover the profits and benefits from the sale of furniture containing Retro Collection designs (Doc. 23 ¶¶ 61, 62), which are analogous to damages specifically recoverable under the Copyright Act. To be sure, Pan-American does allege Defendants have been unjustly enriched because they induced Pan-American to disclose designs. The gravamen of this allegation, however, is that Defendants were unjustly enriched as a result of the wrongful exercise of Pan-American's § 106 rights. It is, therefore, nothing more than a "disguised copyright claim." <u>See Costar Grp. Inc. v. Loopnet, Inc.</u>, 164 F. Supp. 2d 688, 714 (D. Md. 2001) ("[P]reemption is appropriate where [an] unjust enrichment claim does not allege that the defendants were enriched by anything other than copyright infringement."

58

(describing favorably the holding in American Movie Classics Co.
v. Turner Entertainment Co., 922 F. Supp. 926 (S.D.N.Y. 1996))),
aff'd, 373 F.3d 544 (4th Cir. 2004); Artino, 723 F. Supp. 2d at
835 (preemption when plaintiff did not contend defendant
enriched by anything other than unauthorized reproduction and
creation of derivative works from plaintiff's drawings); cf.
Smoot v. Simmons, No. 05-3106, 2006 WL 1999203, at *2, 7 (D. Md.
July 14, 2006) (finding allegations that defendants, after
receiving plaintiff's portfolio as part of a business
solicitation, wrongfully used the designs failed to allege
unjust enrichment beyond copyright infringement).  Pan-American
has not shown that its claim is qualitatively different from a
copyright infringement claim and has, therefore, not
distinguished its claim from the typical unjust enrichment claim
preempted by the Copyright Act.

Further, under North Carolina law "a claim for unjust
enrichment may not be brought in the face of an express
contractual relationship between the parties."  Madison River,
351 F. Supp. 2d at 446 (citing Southeastern, 154 N.C. App. at
331, 572 S.E.2d at 206 (2002)); see Collezione Europa U.S.A.,
Inc. v. Hillsdale House, Ltd., 243 F. Supp. 2d 444, 450-51
(M.D.N.C. 2003) (unjust enrichment claims typically survive a
preemption challenge only when the plaintiff alleges a "quasi-

contractual relationship between parties"); _see also_ _Acorn_
_Structures_, 846 F.2d at 926 (unjust enrichment claim under
Virginia law preempted in face of an undisputed express
contract).  As noted above, Pan-American has pleaded facts
alleging an express contract between it and the Defendants, and
those allegations are incorporated into its unjust enrichment
cause of action.  (Doc. 23 ¶ 59.)  Indeed, all the facts pleaded
with regard to the state law claims allege an express contract
between the parties.  Consequently, Pan-American's claims for
unjust enrichment cannot avoid preemption.  _See_ _Madison River_,
351 F. Supp. 2d at 446.

For the foregoing reasons, Defendants' motion to dismiss
will be granted to this extent, and Pan-American's unjust
enrichment claim (Third Claim for Relief) will be dismissed.

### c.  Unfair Competition/Unfair or Deceptive Trade Practices

Pan-American brings separate causes of action for common
law unfair competition and violation of North Carolina's Unfair
and Deceptive Trade Practice Act, N.C. Gen. Stat. § 75-1.1
("UDTPA").  (Doc. 23 ¶¶ 63-67, 68-76.)  The parties address the
causes of action together (Doc. 31 at 10; Doc. 39 at 10), and
the court will do the same.

Pan-American's common law unfair competition and UDTPA
claims are based on Defendants' alleged misrepresentation that

60

it would use Pan-American as a broker and that, as a result, Defendants received "substantial profits and other benefits from their advertisement, distribution, and sale of furniture" based on misappropriated Retro Collection designs. (Doc. 23 ¶¶ 64-65, 69; see Doc. 23 ¶ 70.) Pan-American further alleges that these acts are more than mere copyright infringement inasmuch as the acts include misrepresentations made by Defendants in order to induce Pan-American to reveal its Retro Collection designs. (Id. ¶¶ 66, 74.) As to its UDTPA claim, Pan-American also alleges that Defendants' conduct "constitutes substantial aggravating circumstances." (Id. ¶ 72.)

Defendants argue that these claims should be preempted by distinguishing this case from the facts pleaded in Baldine v. Furniture Comfort Corp., 956 F. Supp. 580 (M.D.N.C. 1996). There, the plaintiff contended she was induced to work on a design pursuant to an oral agreement under which the defendant agreed to pay a fee in exchange for the design. The court held, at the summary judgment stage, that fraud, not copyright, was the gravamen of a UDTPA claim. Defendants argue that Baldine is factually distinguishable because the plaintiff was attempting to sell her designs, which Pan-American was not attempting to do, and that the entire legal claim would therefore have been governed by contract, not copyright, law. (Doc. 31 at 11, 12.)

61

Defendants argue that Baldine "implicitly acknowledged that, as phrased in her complaint, [her] § 75-1.1 claim would arguably have been subject to dismissal" at the Rule 12(b)(6) stage. (Id. at 10-11.)  Defendants further argue that claims of misrepresentation do not constitute an extra element and therefore cannot be "qualitatively different" from a copyright claim which, in the absence of direct evidence or an admission, requires a showing that a defendant had access to the original work and that the defendant's work is substantially similar. (Id. at 13-14.)  Finally, Defendants assert that it is "well-settled in North Carolina that a promissory representation will not support a claim grounded in deceit absent an allegation that the promisor had no present intention of performing the promise at the time the representation was made" and that, to the extent Pan-American's claims are based on misrepresentation, they are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  (Doc. 44 at 8.)

Pan-American responds by stating that its claims arise out of the misrepresentation made by Defendants to induce Pan-American to give access to designs which otherwise would have been kept confidential.  (Doc. 39 at 11.)  It also argues that Baldine applies to the FAC's allegations.  (Doc. 39 at 11-13.)  Pan-American asserts that (1) whether it has a valid copyright

is irrelevant to its UDTPA and unfair competition claims and (2) whether Defendants made misrepresentations is irrelevant to its copyright infringement claims and, therefore, the UDTPA and unfair copyright claims are not equivalent to rights protected by the Copyright Act. (Id. at 10.)

The tort of common law unfair competition is recognized in North Carolina "as an offense committed in the context of competition between business rivals." Henderson v. U.S. Fidelity & Guar. Co., 346 N.C. 741, 749, 488 S.E.2d 234, 239-40 (1997) ("The gravamen of unfair competition is the protection of a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money."). Common examples of extra elements in unfair competition claims that typically avoid preemption include "breach of fiduciary duty, breach of a confidential relationship, and palming off of the defendant's products as those of the plaintiff's." Old South Home Co. v. Keystone Realty Group, Inc., 233 F. Supp. 2d 734, 737 (M.D.N.C. 2002) (quoting Kindergartners Count, Inc. v. Demoulin, 171 F. Supp. 2d 1183, 1191 (D. Kan. 2001)).

To state a prima facie claim under the UDTPA, a party must establish that (1) the defendant engaged in an "unfair" or "deceptive" act or practice, (2) the act was in or affecting commerce, and (3) the act injured the plaintiff. N.C. Gen.

Stat. § 75.1-1; Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). These three elements are the only ones *required* to state a claim under the UDTPA, even though a party might allege additional aspects of unfairness or deception as part of a particular claim. At first blush, therefore, the UDTPA claim might appear to be preempted by the Copyright Act, because the UDTPA does not *require* an element beyond those necessary to constitute a prima facie claim of copyright infringement. See Rosciszewski, 1 F.3d at 229-30 (analyzing the "required" and "necessary" elements of respective causes of action); Iconbazaar, 308 F. Supp. 2d at 637 (preempting UDTPA claim because no extra element is required). Because of the sweeping breadth of a UDTPA claim, however, it is possible for the claim to rest on conduct apart from that comprising the Copyright Act claim. As noted above, in appropriate cases courts will consider allegations in making a preemption determination. This is particularly so regarding claims under the UDTPA, which regulates "unfair" and "deceptive" conduct broadly and whose scope depends on the conduct alleged to constitute the violation. E.g., Collezione, 243 F. Supp. 2d at 449-50; Old South Home, 233 F. Supp. 2d at 737-39; Baldine, 956 F. Supp. at 587-88. Thus, Pan-American's extra allegations may save its UDTPA claim from preemption, but only if they

64

independently support it and render it qualitatively different from a Copyright Act violation. A plaintiff cannot create an extra element to avoid preemption merely by predicating a UDTPA claim on the same actions giving rise to the copyright infringement claim. Collezione, 243 F. Supp. 2d at 450. Put differently, in order to survive preemption, allegations of what constitutes "unfairness" and "deception" to support a UDTPA claim must rest on sufficient alleged misconduct separate from, and not controlled by, the Copyright Act.

With these principles in mind, the court turns to Baldine, the opinion at the center of arguments presented by Pan-American and Defendants. In Baldine, the plaintiff, in addition to alleging a copyright claim, alleged that the defendant falsely agreed to pay her to work on a design when he intended to use the designs she developed without paying for them. Baldine, 956 F. Supp. at 587. The court held that "[f]alse representations made by [defendant's agent] . . . for the purpose of obtaining [the plaintiff's] design with intent to use it without paying for it would constitute a viable claim under [N.C. Gen. Stat. §] 75-1.1 since the fraud and not the actual copyright violation would be the gravamen of the claim." Id.

The court finds Baldine analogous to this case. The fact that the parties in Baldine allegedly intended for the design

copyright to be transferred to the plaintiff, while in this case Pan-American alleges the copyright was to remain with it, is a distinction without a difference. In both cases, the alleged conduct relates to obtaining the plaintiff's designs through improper means: in Baldine, obtaining designs by promising to pay for them with no intent to do so, and in this case, allegedly obtaining designs by promising falsely to use them pursuant to contracts entitling Pan-American to broker fees. For example, in its FAC Pan-American alleges that Defendants misrepresented "that [they] would use Pan-American as the broker . . . in order to obtain and misappropriate the Retro Collection designs." (Doc. 23 ¶ 69 (emphasis added).) Pan-American makes specific allegations as to the time, place, and contents of the deception. (Id. ¶¶ 31-34, 69.) These allegations are legally indistinguishable from those in Baldine.

This conclusion is consistent with cases that distinguish Baldine. In Vogel v. Wolters Kluwer Health, Inc., 630 F. Supp. 2d 585 (M.D.N.C. 2008), the court found a UDTPA claim preempted because, unlike Baldine, the plaintiff had at most alleged that defendants knew they were infringing plaintiff's copyrights and attempted to prevent the plaintiff from learning about it. In that case, the only difference between the copyright claim and UDTPA claim was "the insertion of an additional allegation of

deception." Vogel, 630 F. Supp. 2d at 587, 593-95 (adopting Magistrate Judge's report and recommendation and noting that an action will not be saved from preemption by elements such as awareness and intent that alter the action's scope but not its nature, citing Rosciszewski, 1 F.3d at 230).

Similarly, the court in Collezione found preemption where, unlike Baldine, the plaintiff "alleged no fraud" and "no relationship existed between the parties prior to the acts constituting the alleged infringement." Collezione, 243 F. Supp. 2d at 450. Rather, "[t]he copyright violation remain[ed] the gravamen of the claim." Id. (noting that allegations that characterized defendant's failure to give credit to plaintiff for the design as deceptive simply restate the underlying conduct, i.e., unauthorized copying). A UDTPA plaintiff must allege more than an unfair trade practice by copying or reproducing in order to avoid preemption; the plaintiff "must present some claim of misrepresentation, deception, confidential relationship, or palming off." Innovative Med. Prods., Inc. v. Felmet, 472 F. Supp. 2d 678, 683 (M.D.N.C. 2006). Unfair competition claims based on misappropriation, without more, only protect the same rights Congress sought to protect by the Copyright Act and, as a result, are preempted. See Progressive Corp. v. Integon P & C Corp., 947 F.2d 942, 1991 WL 218010, at

*6 (4th Cir. 2001) (unpublished table decision) (citing authority).

Pan-American alleges more than the simple misappropriation at the heart of all copyright actions; it alleges misrepresentation based on an existing relationship between the parties. Although no allegation is made that the relationship was in the nature of a confidential relationship akin to employer-employee, the alleged misrepresentation is more than a copyright infringer's knowledge that it is violating another's copyright or its intention to do so.

Defendants' attempt to distinguish Baldine by suggesting that the result would have been different at the motion to dismiss stage is not persuasive. The court noted that the claim asserted in the complaint, which might fairly be interpreted standing alone as a restatement of the copyright claim, re-alleged earlier factual allegations, "including [the defendant's agent's] representations about an agreement having been reached and payment being forthcoming." Baldine, 956 F. Supp. at 587. Contrary to Defendants' argument, the court did not "implicitly" acknowledge that these allegations were insufficient and saved only by plaintiff's subsequent deposition testimony prior to the summary judgment determination. Rather, the court stated that the testimony was "the same account" as that set forth in the

complaint. _Id._ Thus, the procedural posture of the case is not determinative for our purposes.

Finally, Defendants assert that Pan-American's "evident inability" to allege a promissory fraud claim is fatal to its UDTPA and unfair competition claims. This is so, they contend, because promissory fraud is grounded on an assertion that a promisor had no intent to fulfill a promise at the time the representation is made. (Doc. 44 at 8.) First, the court does not address matters newly raised in a reply. LR7.3(h) (M.D.N.C.). Second, even if Defendants' argument is properly considered to have been raised in its initial brief, the court finds that Pan-American's allegations sufficiently allege that Defendants did not intend to use Pan-American as a broker when it made that promise in order to obtain copies of confidential designs. (See Doc. 23 ¶ 31-34, 69.)

The court notes that "[s]imple breach of contract or failure to pay a debt do not qualify as unfair or deceptive acts, but rather must be characterized by some type of egregious or aggravating circumstances before the statute applies." Norman Owen Trucking, Inc. v. Morkoski, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998). Aggravating factors include an intentional misrepresentation for the purpose of deceiving another and which has a natural tendency to injure the other.

Baldine, 956 F. Supp. at 587-88 (citing Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 418 S.E.2d 694, 700 (1992)). At the motion to dismiss stage, a complaint must allege facts stating all the elements of the claim, which here include allegations of some type of egregious or aggravating circumstances. Kelly v. CitiFinancial Servs., Inc., 696 S.E.2d 775, 781-82 (N.C. App. 2010). As discussed supra, Pan-American's allegations, both factual as well as an allegation specifically alleging "aggravating circumstances," satisfy this requirement.[15]

As in Baldine, the alleged false representations here are claimed to have been for the purpose of obtaining (admittedly for use) plaintiff's designs without paying via the broker's fee. In such case, "the fraud and not the actual copyright violation would be the gravamen of the claim."[16] Baldine, 596 F.

---

[15] Defendants' reply asserts that the heightened pleading standard in Rule 9(b) applies. Although there is authority that Rule 9(b) does not apply to a UDTPA claim based on deception, e.g., Smith v. Dade Behring Holdings, Inc., No. 1:05CV86, 2007 WL 152119, at *18 (W.D.N.C. Jan. 16, 2007) (Magistrate Judge's report and recommendation adopted by district court), Pan-American's UDTPA and unjust competition claims as alleged may be subject to the heightened standard. The court need not determine which pleading standard applies to these claims, however, because the allegations in the complaint are sufficient under either standard. See Hunter v. Jackson Hewitt, Inc., No. 3:06-0919, 2007 WL 3376841, at *10 (S.D.W. Va. Nov. 6, 2007).

[16] This language from Baldine does not suggest that a copyright claim could not also be stated. Indeed, the court permitted Baldine's

Supp. at 587. Accordingly, Pan-American's UDTPA and common law unfair competition claims state an additional element sufficient to survive Defendants' motion to dismiss, which will be denied.[17]

## C. Validity of Copyright and Alleged Infringement

A plaintiff asserting a copyright infringement claim must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); see 17 U.S.C. § 501. When an infringement occurs, the copyright owner "is entitled, subject to the requirements of section 411, to institute an action for any infringement." 17 U.S.C. § 501(b). With certain exceptions not applicable here, no civil action for infringement may be brought until the copyright claim has been registered or preregistered in accordance with the Copyright Act.[18] 17 U.S.C. § 411(a).

_____

copyright claim to continue along with her other claims, denying the motion for summary judgment. Baldine, 956 F. Supp. at 584-87, 588.

[17] The Fourth Circuit has held that federal preemption of state law is a constitutional question because it is based on the Supremacy Clause and that when a party provides alternative independent state law grounds for disposing of a case, courts should not decide the constitutional issue of preemption before considering state law grounds. Columbia Venture, LLC v. Dewberry & Davis, LLC, 604 F.3d 824, 828 (4th Cir. 2010). In this case, Pan-American has alleged sufficient aggravating factors to survive a motion to dismiss based on a failure to state a UDTPA claim under state law.

[18] This pre-suit registration requirement is not jurisdictional. Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237, 1243 n.2, 1244-46, 1249 (2010), abrogating Xoom, Inc. v. Imageline, Inc., 323 F.3d 279 (4th Cir. 2003). Defendants have not sought dismissal under Rule 12(b)(1).

Pan-American alleges that the Retro Collection designs are original, creative works which do not serve any useful purpose, are separable from the functional and utilitarian aspects of furniture, and, therefore, copyrightable. Pan-American further alleges that Defendants copied original elements of those designs and have, without authorization, reproduced, distributed, displayed, and prepared derivative works based on those designs and have displayed such works in violation of the Copyright Act. (Doc. 23 ¶¶ 25-28, 52; Doc. 39 at 13.)

Defendants challenge both the validity of Pan-American's copyrights and related assertions of infringement. First, Defendants argue that because the design of a useful article is not copyrightable subject matter, the Retro Collection designs cannot enjoy copyright protection because they consist of simple geometric shapes and the idea of alternating the grain in a series of wood panels, thereby lacking originality. Defendants also argue that by limiting the scope of potential copyrightable features in its designs to "2-D Artwork," Pan-American waived any claims to three-dimensional sculptural detailing. (Doc. 31 at 15-18.) Because the U.S. Copyright Office rejected Pan-American's applications for copyright beyond its earlier two-dimensional designs, Defendants assert the court should dismiss

As discussed <u>infra</u>, however, registration remains a requirement, although one of procedure rather than subject matter jurisdiction.

Pan-American's claims to the extent based upon the rejected applications. (Doc. 44 at 10.) Second, Defendants argue that Pan-American fails to plead a plausible claim for copyright infringement in light of the absence of an allegation that any copyrightable two-dimensional artwork has been incorporated into the articles sold by Defendants. (Doc. 31 at 19.)[19]

---

[19] Defendants also argue that Pan-American fails to state a claim upon which relief may be granted because its lawsuit is based, in part, on pending applications for registration with respect to three-dimensional designs and has, therefore, failed to satisfy a prerequisite to bringing a copyright action. (Doc. 31 at 19-20.) As noted above, Pan-American applied for registration of three-dimensional designs just prior to filing the FAC, and the Register of Copyrights subsequently refused registration. When the application, deposit, and fee have been made and the registration refused, the applicant is entitled to institute an action for infringement if proper notice of the action has been given to the Register of Copyrights, who may become a party to the action with respect to the issue of registrability of the copyright claim. 17 U.S.C. § 411(a); see Muchnick, 130 S. Ct. at 1246 ("§ 411(a) expressly allows courts to adjudicate infringement claims . . . where the holder attempted to register the work and registration was refused."). The FAC, however, pre-dates the Register of Copyrights' action on the application. There is a split in authority regarding whether an application, deposit, and payment of fees is sufficient, or whether the Register of Copyrights must first have acted on the application prior to initiation of a lawsuit. See, e.g., Matthew J. Astle, "Help! I've been Infringed and I can't Sue!: New Approaches to Copyright Registration," 41 U. Mem. L. Rev. 449, 465, 471-88 (Spring 2011) (discussing split in authority and noting that after Muchnick plaintiffs still need to comply with § 411(a), which remains a mandatory claim-processing rule); 2-7 Nimmer on Copyright § 7.16 (noting a "welter of litigation has arisen" over the issue). This court has held that a suit may be instituted upon filing of a completed application. See Iconbazaar, 308 F. Supp. 2d at 633-34 (interpreting statute and noting that the process of evaluating an application can be a lengthy one). This approach is consistent with the "application approach" advocated by Nimmer. 2-7 Nimmer on Copyright § 7.16 (suggesting grounds for the application approach strengthened by Muchnick's holding). In light of Iconbazaar, the Register of Copyrights' completed action on Pan-American's three-dimensional design application, and Pan-American's notice (albeit

Pan-American responds to Defendants' copyright validity challenge by arguing its designs are copyrightable because they are (1) original and (2) conceptually separable from the utilitarian aspects of the furniture. Its designs, Pan-American asserts, possess at least a minimal degree of creativity and, therefore, are original under the Copyright Act. Further, Pan-American argues, while geometric shapes, colors, and ideas are not in themselves copyrightable, the Retro Collection "incorporate[s] compilations of geometric shapes (i.e., collection of panels) along with coloring (i.e., the alternating wood grains) in connection with each other." (Doc. 39 at 15.) This combination of features, Pan-American concludes, results in a unique combination sufficient to establish the threshold for originality. Pan-American's brief does not fully address the "conceptually separable" issue, stating that "Rooms to Go does not argue that these works of art embodied in the Retro Collection designs cannot exist independently of the utilitarian aspects of the furniture," but rather challenges whether the designs are sufficiently "original." (Id. at 14-16.) With respect to Defendants' argument that they have not infringed the Retro Collection designs, Pan-American argues that it's copyright extends to three-dimensional reproductions utilized by

belated) to the Register of Copyrights (Doc. 39-1), the court will not dismiss Pan-American's claims on this ground.

Defendants because such constitute derivative works of its copyrighted two-dimensional designs. Pan-American also asserts that the court should consider whether its three-dimensional designs are copyrightable despite rejection by the U.S. Copyright Office. (Doc. 39 at 17-18.)

Pan-American, as Defendants assert, is not entitled to a presumption of validity under § 410(c) because the applications for certificates of registration were not made within five years of publication. (See Doc. 23 ¶¶ 43, 44; Doc. 23-4 Ex. D.) The evidentiary weight given registration, therefore, is within the discretion of the court. 17 U.S.C. § 410(c). Further, a court should be wary of giving the fact of registration much weight, even when the presumption of validity applies, because "the Copyright Office's practice of summarily issuing registrations (perhaps even the day of filing the application . . .) counsels against placing too much weight on registrations as proof of a valid copyright." Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 428 (4th Cir. 2010). At this stage of the litigation, however, the court is tasked with determining whether Pan-American has stated a plausible claim for copyright infringement.

Under the Copyright Act, "useful articles" as a whole, such as furniture, are not eligible for copyright protection,

75

although individual design elements may be. <u>See</u> <u>Amini</u> <u>Innovation Corp. v. Anthony Cal., Inc.</u>, 439 F.3d 1365, 1369 (Fed. Cir. 2006) (noting that as a general rule a "purely utilitarian article – such as bedroom furniture – receives no protection"). Thus, the design of a useful article

> shall be considered a pictorial, graphic, or sculptural work *only if, and only to the extent that*, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101 (emphasis added); <u>see Universal Furniture</u>, 618 F.3d at 432 & n.6. A "useful article" is one "having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally part of a useful article is considered a 'useful article.'" 17 U.S.C. § 101. In making this determination, a court is called upon to determine, first, if the designs are conceptually separable from the utilitarian aspects of furniture and, second, whether such separable designs are entitled to copyright protection. <u>Universal Furniture</u>, 618 F.3d at 432; <u>Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.</u>, 74 F.3d 488, 493 (4th Cir. 1996) ("Thus, the industrial design of a unique, aesthetically pleasing chair cannot be separated from the chair's utilitarian function and, therefore, is not subject to copyright protection. But the

76

design of a statue portraying a dancer, created merely for its expressive form, continues to be copyrightable even when it has been included as the base of a lamp which is utilitarian.").

Thus, to establish a valid copyright in this case Pan-American must show that the Retro Collection designs are "(1) original and (2) conceptually separable from the utilitarian aspects of the furniture." Universal Furniture, 618 F.3d at 429.

### 1. Originality

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). "Works of authorship" categories include pictorial, graphic, and sculptural works. Id. Copyright protection does not extend to any idea or concept. 17 U.S.C. 102(b).

"Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works) and that it possesses at least some minimal degree of creativity." Universal Furniture, 618 F.3d at 430 (quoting Feist, 499 U.S. at 345). Although a low threshold, copyright protection is not available for familiar symbols and designs. As stated by the Copyright Office in its internal manual:

77

> Registration cannot be based upon the simplicity of
> standard ornamentation such as chevron stripes, the
> attractiveness of a conventional fleur-de-lys design,
> or the religious significance of a plain cross.
> Similarly, it is not possible to copyright common
> geometric figures or shapes such as the hexagon or the
> ellipse, a standard symbol such as an arrow or a five-
> pointed star. . . .
>
> [I]t is not possible to copyright common geometric
> figures or shapes in three-dimensional form, such as
> the cone, cube or sphere.

2 Patry on Copyright § 4:17 & n.1 (quoting Copyright Office,

Compendium II of Copyright Office Practices § 503.02(a), (b));

see Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 35

(1st Cir. 2001) ("This collection of common geometric shapes

with a particular photographic technique is not sufficiently

original to qualify for copyright protection." (citing cases));

Atari Games Corp. v. Oman, 979 F.2d 242, 247 (D.C. Cir. 1992)

("We do not in any way question the Register's position that

'simple geometric shapes and coloring alone are per se not

copyrightable.'"). However, "[e]ven when the work at issue is a

compilation of preexisting design elements, the originality

threshold remains low: 'Copyright protection may extend to such

a compilation, even if the material of which it is composed is

not copyrightable itself.'" Universal Furniture, 618 F.3d at

430.

    The "Chaplin Collection" designs attached to the complaint

(Doc. 23-3, Ex. C) appear to show furniture incorporating panels

78

and strips of wood in which wood grain in one panel or strip is horizontal while wood grain in an adjacent panel or strip is vertical. This is in accord with Pan-American's description example of "a collection of panels with alternating grains." (Doc. 23 ¶ 26.) Wood grain (and simulated wood grain) naturally run roughly parallel on a panel or strip of wood. The determinative issue on copyright validity in this case appears to be whether these patterns, in combination with other design features (e.g., appliques), or those other design features alone, are copyrightable.

This presents a close question on this record. Generally speaking, arranging the grain of one panel or strip of wood at a right angle to an adjacent panel or strip (i.e., by simple rotation of a panel or strip 90 degrees) challenges the originality contemplated by the Copyright Act. However, the record is not complete, and the issue is better resolved at the summary judgment stage (or, if appropriate, at trial). As noted in Universal Furniture, a sparse record at an early stage in the proceedings suggesting a weak copyright claim may, on a full record, result in a finding of furniture designs properly copyrighted and infringement by the defendant. 618 F.3d at 426, 432; cf. Woods v. Bourne Co., 60 F.3d 978, 991 (2d Cir. 1995) ("To determine whether a work is sufficiently original to be a

derivative work, the judge in a bench trial must make finding of fact based upon a comparison of two works."); FragranceNet.com, Inc. v. FragranceX.com, Inc., 679 F. Supp. 2d 312, 323 (E.D.N.Y. 2010) ("The determination of the originality of a derivative work is a factual question that is inappropriate for determination on a motion to dismiss."). Therefore, the court declines to hold on this record that Pan-American's designs fail to enjoy copyright protection.

### 2. Conceptually Separate

Although noting the requirement that copyrightable matter exists for furniture only to the extent the features of the designs can be identified separately from and exist independently of the utilitarian aspects of the furniture, Defendants do not seriously argue that such designs fail to meet this requirement. While the "*shape* of the furniture cannot be the subject of a copyright, no matter how aesthetically pleasing it may be . . . *decorative elements* that are separable from the furniture can be." Universal Furniture, 618 F.3d at 433 (quoting and approving language in district court opinion). Accordingly, the court finds the FAC sufficiently alleges this requirement for purposes of the motion to dismiss analysis.

### 3. Infringement

Pan-American alleges that all of Rooms to Go's Chaplin Collection incorporates design elements of the Retro Collection. (Doc. 23 ¶¶ 38-39.) The copies of Pan-American's Retro Collection furniture and Rooms To Go's Chaplin Collection furniture attached to the FAC include apparent design similarities.[20] (See Doc. 23-1, Ex. A; Doc. 23-3, Ex. C.) Defendants assert, however, that Pan-American fails to plead a plausible claim for copyright infringement by failing to allege that any copyrightable two-dimensional artwork has been incorporated into the articles sold by Defendants.

Pan-American's three-dimension design claims rejected by the Copyright Office may, as noted above, be raised before this court. The FAC alleges that Pan-American has obtained copyrights on two-dimensional designs for each item of the Retro Collection and has submitted an application "to register its copyrights in the three dimensional/sculptural work embodied in the Retro Collection" furniture. (Doc. 23 ¶¶ 45, 46.) The complaint's copyright infringement claim alleges that Rooms to

---

[20] Under the circumstances in this case, the court may consider exhibits attached to a complaint in considering a Rule 12(b)(6) motion. See Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). To the extent Defendants' argument is that the attachments show no two-dimensional art work that "could conceivably be subject to a valid copyright" (Doc. 31 at 19), that argument fails at this stage of the litigation for the same reasons set out with respect to the court's discussion of originality, supra.

Go has "reproduced, distributed, displayed, and prepared derivative works based upon the copyrighted 'Retro Collection' designs" and that Rooms to Go's "reproductions and/or derivative works include furniture manufactured pursuant to the Retro Collection designs." (Doc. 23 ¶ 52.) The copyright infringement claim incorporates allegations in paragraphs 45 and 46, including reference to three-dimensional work. (Id. 23 ¶ 51.) For purposes of Defendants' motion to dismiss, the court finds that a failure to specifically reference Pan-American's three-dimensional designs which had not received copyright registration does not render the copyright infringement claim implausible.

The exclusive rights provided by § 106 include the right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). Pan-American asserts that its copyrighted two-dimensional designs which received copyright registration apply because Defendants' furniture containing three-dimensional Retro Collection designs constitute a derivative work protected by Pan-American's registered copyrights. There is support for Pan-American's assertion that three-dimensional works can be derivative of two-dimensional designs. See, e.g., Entm't Research Group, Inc. v. Genesis Creative Group, Inc., 122 F.3d 1211, 1219-20 (9th Cir. 1997) (addressing copyrightability of

derivative three-dimensional representations of preexisting, copyrighted two-dimensional works); W. Goebel Porzellanfabrik v. Action Indus., Inc., 589 F. Supp. 765, 767 (S.D.N.Y. 1984) (finding three-dimensional figures were derivative of two-dimensional sketches; noted in context of "one of the basic principles of copyright law [is] that derivative works can be copyrighted and that such works and their copyrights exist independently of the original works and whatever copyrights may protect them"[21]). Because the court has yet to determine whether Pan-American's three-dimensional designs should be afforded copyright protection, it need not determine at this time whether any copyright protection for Pan-American's two-dimensional designs extends or could extend to Defendants' furniture.

For the above reasons, therefore, Defendants' Rule 12(b)(6) motion to dismiss Pan-American's copyright claim will be denied.

## IV. CONCLUSION

For the reasons set forth above,

IT IS THEREFORE ORDERED that Jurisdictional Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) (Doc. 28) is GRANTED IN PART AND DENIED IN PART without prejudice; the court finds all grounds for assertion of personal jurisdiction over the Jurisdictional Defendants lacking, except

---

[21] Copyright in a derivative work extends only to material contributed by the author of the derivative work. 17 U.S.C. § 103(b).

for Pan-American's "alter ego" theory, as to which Pan-American may pursue jurisdictional discovery;

IT IS FURTHER ORDERED that Plaintiff's Motion in the Alternative for Jurisdictional Discovery (Doc. 34) is GRANTED as to the alter ego theory only; and

IT IS FURTHER ORDERED that Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 30) is GRANTED to the extent of Plaintiff's Third Claim for Relief for unjust enrichment, which is DISMISSED, and DENIED in all other respects.

/s/ Thomas D. Schroeder
United States District Judge

November 14, 2011